MATTER OF SANCHEZ-MONREAL

In EXCLUSION Proceedings

A-12698450

*Decided by Board March 3, 1964*

A dual national of the United States and Mexico at birth who in 1948 purchased a house in Mexico in an area in which only Mexican citizens could own property did not thereby voluntarily seek or claim Mexican nationality in the absence of a showing he represented himself to be a Mexican or knew that ownership must be based upon his being a Mexican citizen. (Cf. *Matter of V—, 7 I. & N. Dec. 218.*)

EXCLUDABLE: Act of 1952—Section 212(a)(20) [8 U.S.C. 1182(a)(20)]—Immigrant without visa.

The special inquiry officer has certified this case in which he has ordered the applicant excluded on the ground stated above. The applicant's admission will be ordered.

The applicant is a 49-year-old married male who has lived in the United States since February 20, 1961 when he entered as a United States citizen. On October 22, 1962 he attempted to return to the United States as a United States citizen after a short visit to Mexico; he was excluded on the ground that he had lost United States citizenship in 1955 and therefore needed a visa entitling him to enter as an alien immigrant. He was paroled into the United States pending final adjudication of his case.

The issue is whether the applicant's purchase of a home in Mexico in 1948 resulted in the loss of United States citizenship under section 350 of the Immigration and Nationality Act (8 U.S.C. 1482) which provides:

A person who acquired at birth the nationality of the United States and of a foreign state and who has voluntarily sought or claimed benefits of the nationality of any foreign state shall lose his United States nationality by hereafter having a continuous residence for three years in the foreign state of which he is a national by birth at any time after attaining the age of twenty-two years unless he shall—

(1) prior to the expiration of such three-year period, take an oath of allegiance to the United States before a United States diplomatic or consular officer in a manner prescribed by the Secretary of State; and

(2) have his residence outside of the United States solely for one of the reasons set forth in paragraph (1), (2), (4), (5), (6), (7), or (8) of section 353, or paragraph (1) or (2) of section 354 of this title: *Provided, however,* That nothing contained in this section shall deprive any person of his United States nationality if his foreign residence shall begin after he shall have attained the age of sixty years and shall have had his residence in the United States for twenty-five years after having attained the age of eighteen years.

Applicant was born in Texas in 1914 of parents who were Mexican nationals at all times. The applicant is married to a Mexican citizen and has seven children; his family resides in Mexico; he began to reside in the United States in 1961, and prior to this had commuted to the United States daily for 26 years to work as a tailor.

For two years starting in 1946 applicant made payments toward the purchase of a house in Mexico in an area in which only Mexican citizens could own land. On May 5, 1948, a contract for the sale of the property was executed and about two months later was recorded (Ex. 4). Title was taken in the name of both the applicant and his wife. In 1955, applicant heard that his ownership of the property in Mexico could affect his United States citizenship. He inquired of the American Consul in Mexico and was apparently told he would lose United States citizenship unless he sold the property or made his home in the United States. Applicant did not then come to the United States for residence; he could not meet the cost of supporting his family in the United States, nor could he afford to maintain a residence both in the United States and in Mexico. He did try to dispose of the property but could not find a buyer at a reasonable price and his wife would not let him dispose of it at a loss. On July 11, 1961, in the belief that the sale of the property would safeguard his United States citizenship, applicant entered into a contract for a sale of his house for 2000 pesos although he had paid over 9000 for it (Ex. 5).

The special inquiry officer finding that the applicant had been a national both of the United States and Mexico at birth, that he had purchased a home in an area where ownership of land was restricted to Mexican nationals, that this purchase constituted a voluntary seeking or claim of the benefits of the Mexican nationality, that applicant had resided in Mexico for the necessary period after claim of the benefit, concluded that applicant had lost United States citizenship under section 350 of the Act.

Counsel contends that applicant was not a dual national after 1939. He contends that applicant had lost Mexican nationality in 1939 by applying for a United States citizen's identification card. Moreover, counsel contends applicant had never voluntarily sought or claimed a benefit of Mexican nationality.

We find that the applicant has failed to establish that he lost Mexican nationality in 1939, or thereafter by applying for United

States identification. The applicant became a citizen of the United States at birth under the Fourteenth Amendment of the Constitution of the United States and section 1992 of the Act of April 9, 1866. He became a Mexican national at birth under Article 30 of the Mexican Constitution which provides as follows:

Mexican nationality is acquired by birth or by naturalization.
A. Mexicans by birth are:
    I. Those who are born in territory of the Republic, regardless of the of the nationality of their parents;
    II. Those who are born in foreign countries of Mexican parents; of a Mexican father and an 'alien mother; or of a Mexican mother and a father of unknown nationality; and
    III. Those who are born on board of Mexican vessels or airships, whether warships or merchant ships.
B. Mexicans by naturalization are:
    I. Aliens who obtain a letter of naturalization from the Department of Foreign Relations, and
    II. Any alien woman who marries a Mexican and has or establishes residence within the national territory.

Loss of Mexican nationality is governed by Article 37, Political Constitution of the United Mexican States as amended, and Article 3 of the Law of Nationality and Naturalization which provide as follows:

A. Mexican nationality is lost:
    I. By voluntary acquisition of a foreign nationality;
    II. By accepting or using titles of nobility that imply submission to a foreign state;
    III. By residing, being Mexican by naturalization, for five years continuously in the country of origin; and
    IV. By passing in any public instrument, being Mexican by naturalization, as a foreigner, or by obtaining and using a foreign passport. (Article 37)

Mexican nationality is lost:
    I. By voluntarily acquiring a foreign nationality, it being understood that it is not a voluntary acquisition when it may have occurred by operation of law, by simple residence, or by being an indispensable condition for obtaining work or for retaining work already acquired, in the judgment of the Secretary of Foreign Relations;
    II. By accepting or using titles of nobility that imply submission to a foreign state;
    III. By residing, being a Mexican by naturalization, for five continuous years in the country of origin;
    IV. By representing himself in any public instrument, being a Mexican by naturalization, as a foreigner, or by obtaining and using a foreign passport.

The loss of Mexican nationality only affects the person who has lost it. (Article 3, Law of Nationality and Naturalization)

Applicant maintains that he lost Mexican nationality in 1939 under paragraph IV of the above articles. The Service contends that all

of paragraph IV relates to a Mexican by naturalization only and therefore does not relate to the applicant whose Mexican nationality arose other than by naturalization. The Service contention is based on the belief that only a naturalized Mexican is mentioned in the article. The applicant, however, maintains that while the first part of the article, that is, the portion concerning the passing as a foreigner in a public instrument, relates to a naturalized Mexican only, the remainder of the section relates to either a Mexican by naturalization or one by birth.

In support of his argument, the applicant presented an attorney admitted to practice in Mexico who had no experience with Mexican nationality law but who testified that such experience was not necessary to interpret the nationality law. The attorney testified that the portion of paragraph IV preceding the last comma, related to a Mexican by naturalization, and the portion following the same comma related to a Mexican by birth. The basis for the latter part of his conclusion was twofold: (1) he is of the belief that a Mexican by birth was alone capable of using a foreign passport within Mexico— the Mexican by naturalization being able to use only a Mexican passport (p. 58), and (2) he is of the belief that the punctuation of Article 37(A)(IV) makes the first part refer to Mexicans by naturalization and the second part to Mexicans by birth (p. 57).

The witness' attention was called to the fact that paragraph IV of Article 37 as translated in the United Nation's Legislative Series calls for the loss of Mexican nationality by a person who—

Being a Mexican national by naturalization, represents himself as an alien in any public instrument, or obtains and uses a foreign passport.

The witness commented that the translation had changed the word order of the Spanish (p. 60).[1]

The Service conducted an investigation to determine the meaning of this section. On May 2, 1963, the District Director, El Paso, Texas, sent a letter to the District Director in Mexico asking that an opinion be obtained from the Office of the Attorney General of Mexico (Ex. 11, p. 1). (We take administrative notice that the District Director at Mexico City is the administrative official who supervises the activities of subordinates in charge of offices in certain cities in Mexico and that Donald G. Brown is the subordinate in charge of the office in Mexico City.) On May 9, 1963, Donald G. Brown sent a letter to Fernando Roman Lugo, Attorney General of Justice of the District and Federal Territories, Attorney General's Office of the Republic of Mexico, D.F.,

---

[1] The Spanish reads as follows: Por harcerse pasar en qualquier instrumento público, siendo mexicano por naturalización, como extranjero, o por obtener y usar un pasaporte extranjero. (Ex. 10)

stating that the applicant had been born in Texas of Mexican parents and that he had in 1939 applied for and obtained a card of identification as a citizen and claimed that this act brought about the loss of his Mexican nationality under Article 37, paragraph IV. The letter asked for the opinion of the Attorney General as to whether loss of Mexican nationality occurred (Ex. 11, pp. 3-5). On a sheet of paper without letterhead, signature, or date, but to which is stapled the card of Lic. Oscar Trevino-Rios, the Sub Procurador General de la Republica, is an opinion stating that paragraph IV of Article 37 brings about the loss of Mexican nationality only where it is acquired by naturalization and that this fact is so clear as to require no detailed comment (Ex. 11, pp. 6-7). On May 27, 1963, the Acting District Director at Mexico City forwarded to the District Director, El Paso, Texas, "the opinion of Lic. Oscar Trevino-Rios, Sub Procurador General de la Republica regarding the citizenship of the subject." (Ex. 11, p. 6)

Over counsel's objection that a proper foundation had not been laid, the special inquiry officer permitted the opinion from the Mexican official to be placed into evidence, and considered it as expert testimony on the issue. Finding the two experts in disagreement, the special inquiry officer made his own findings in the matter ruling (1) that paragraph IV applied only to Mexicans by naturalization and (2) that identification cards obtained by applicant in 1939 and 1948 were not passports (pp. 6-7, special inquiry officer opinion).

We believe counsel's objection to the introduction of the opinion from the Mexican official was well taken and will give the opinion no weight. Nevertheless, we reach the same conclusion as did the special inquiry officer concerning the interpretation to be given to the section. The weight to be given the opinion evidence produced on applicant's behalf must stand upon the witness' expertise (the witness does not specialize in Mexican nationality laws), the authorities advanced by him (his interpretation is not based upon judicial authorities or otherwise supported), and the process of his reasoning (a grammatical construction and a belief for which no support is given that only a Mexican national by birth can obtain and use a foreign passport). In examining the witness' reasoning we may consult the foreign statutes which are part of the record and the law derived from the statutes "in spite of the fact that the uncontradicted testimony of the experts places a contrary interpretation thereon" (20 Am. Jur., Evidence, Section 1210, pages 1061-2; see *Application of Chase National Bank*, 191 F. Supp. 206, S.D. N.Y. (1961) affirmed 297 F. 2d 611, 2d Cir. (1962)).

Examination of Article 37 reveals that the first paragraph relating to loss by acquisition of foreign nationality and the second paragraph relating to loss by use of foreign titles of nobility, apply to a person of Mexican nationality generally; that the third paragraph mentions only

the Mexican by naturalization found in the condition of having renewed his residence in the country of his origin; and that the fourth paragraph mentioning only the Mexican by naturalization sets forth two additional conditions for loss of citizenship both arising out of the use of non-Mexican public instruments or passports. The witness' construction of paragraph IV is that the first condition—representation of oneself as a foreigner in a Mexican public document—refers to the expressed subject of the paragraph: the naturalized Mexican, and that the second condition—use of a non-Mexican passport—refers to an implied subject: the native-born Mexican. We must reject this construction. Grammatically, there is no reason to change the expressed subject of the paragraph (Mexican by naturalization) and substitute therefor a subject (Mexican by birth) to whom part of the paragraph would apply *to the exclusion of the expressed subject*. Moreover, it is difficult to believe that in a matter as important as citizenship loss should result by implication. We find equally unconvincing the pragmatic approach of the witness—the contention that paragraph IV cannot be read sensibly unless the portion concerning loss by use of a foreign passport is held to refer to the Mexican by birth only because he alone by virtue of his dual nationality is in a position to obtain a foreign passport. The witness has failed to show why a naturalized Mexican could not obtain a passport from a foreign nation. It appears to us that just as the naturalized Mexican may claim in a Mexican public document that he is a foreign national and thus bring himself within the first part of paragraph IV, so may he claim in an application for a foreign passport that he is still a foreign national. Neither grammar nor logic requires acceptance of the reading given by applicant's expert.

We may also point out that counsel takes issue with the opinion of his own witness for counsel believes that the last part of paragraph IV applies to both Mexican nationals by birth and naturalization whereas the expert is of the belief that it applies only to Mexicans by birth. We note also that the United Nations translation of paragraph IV makes it apply only to a Mexican national by naturalization (Ex. 10). For the reasons stated, we conclude that the applicant did not lose Mexican nationality under paragraph IV of Article 37. (The special inquiry officer has also pointed out that the United States citizen's identification card which counsel considers a passport states that "it is not a passport" (Ex. 3); the special inquiry officer has concluded that reason alone would prevent the application of paragraph IV. Counsel contends that Mexico regards such a document as a passport. We do not find the record adequate on this issue and make no ruling on the issue.)

635

The applicant's expert testified that the applicant also lost Mexican nationality under Article 37(A), paragraph I by having voluntarily obtained a United States citizen's identification card in 1939—such action amounted either to the voluntary acquisition of foreign (United States) nationality or an election of United States nationality and implied renunciation of Mexican nationality (pp. 38–42, pp. 65–69). The Service supplied no expert testimony on this issue. The special inquiry officer found that no naturalization had occurred: obtaining the card was not an act of naturalization but a sign that applicant was already a United States citizen. Counsel contends that it is error to reject the uncontradicted opinion of the expert in the matter. The remarks we made previously concerning the weight and sufficiency of the opinion evidence apply here too. We must therefore examine the record and the statute to determine if the expert's uncontradicted opinion is acceptable. The expert has failed to set forth laws and precedents which establish that a dual national's exercise of rights of the nationality other than Mexican constitutes a naturalization under Mexican law. We do not believe that the applicant's use of a right of his United States nationality constitutes such a naturalization or election because Mexico recognizes that a Mexican national may validly possess the rights of dual nationality (p. 38). The International Treaty upon which the expert bases his conclusion that applicant made an election of United States nationality and renunciation of Mexican is not set forth for our examination.

Having determined that the applicant had not lost dual nationality prior to the effective date of section 350 of the Act (December 24, 1952), we may proceed to the issue as to whether he lost United States nationality by taking title to land in Juarez, Mexico on May 5, 1948 and holding title until July 11, 1961—the land being located in an area in Mexico within 100 kilometers of that country's border.

The law restricting title to certain lands in Mexico only to Mexican nationals is found in Article 27, paragraph I of the Political Constitution of the United Mexican States which provides as follows:

Only Mexicans by birth or by naturalization, and Mexican societies have the right to acquire control over land, water and its accessions or to obtain concessions for the exploitation of mines, waters or combustible minerals in the Mexican Republic. The state may concede the same right to aliens provided they agree before the Department of Relations to consider themselves as nationals with respect to said possessions and not invoke therefor the protection of their governments with reference to them under the penalty in the case of default in the agreement, to lose in benefit of the Nation, the possessions acquired by virtue of the same. In a zone one hundred kilometers along the border and fifty from the seacoast aliens may not under any circumstances acquire direct control over land and water.

The registration of applicant's title follows in pertinent part:

In the City of Juarez, Chihuahua, at twelve-thirty on the fourteenth day of August Nineteen Hundred Forty-eight, before the Registrar that is authorized by Attorney Miguel Collado, there was presented for registration in this Section, an instrument of Bargain and Sale not officially recorded, executed in this City the fifth day of May of the current year by which the owner Natividad Trevizo Corral, single, sells to Mr. Ismael Sanchez Monreal, married and to his wife Mrs. Guadalupe Sanchez de Sanchez for the sum of $500.00 Five Hundred pesos, an urban property * * * (description follows) * * *. Thus the present which is returned with the respective note remains recorded. I certify. Miguel Collado. (Ex. 4)

The special inquiry officer held that applicant's taking of title to property which could be held only by a Mexican national constituted the voluntary claiming of the benefits of foreign nationality and resulted in applicant's loss of United States citizenship. Counsel contends that the taking of title did not result in loss of United States citizenship under section 350 of the Act because the record does not establish that applicant actually claimed the benefits of his Mexican nationality in making the purchase. In support of his contention counsel points out that the record of transfer reveals neither that inquiry was made as to applicant's nationality nor that applicant held himself out to be a Mexican national. Counsel further states that an American citizen who does not have Mexican nationality can acquire an interest in real estate within the forbidden zone in error and that title taken in error cannot be divested until the American citizen has been granted a period of one year within which to sell the property. Having thus established that one other than a Mexican national can hold property and that applicant had not claimed Mexican nationality in purchasing the property, counsel concludes that no positive act of claiming or seeking benefits has been established, and section 350 does not therefore apply.

Applicant's expert witness testified that at the time of executing a contract for sale of real estate, it is the obligation of a notary to establish the citizenship of the buyer (p. 27), that this is so whether or not the property is within the 100 kilometer zone (p. 32), and that the notary cannot permit the consummation of the transaction in the forbidden zone under penalty of law if he determines that the buyer is not a Mexican citizen (pp. 32-33). The witness stated that the title to property would not necessarily show whether or not the official had questioned the parties concerning the nationality of the buyer (p. 35). The witness' testimony is inconsistent as to whether there is a requirement in the law that the instrument record the buyer's nationality. At one point he testified that there was no such requirement (p. 35); elsewhere he testified that the law did require that nationality be set forth in all contracts (p. 36). The witness examined the title in the

637

instant case and stated it was not made out before a notary or judge although the law provided for the drawing up of such an agreement between the parties where the value of the property is less than 1000 pesos (pp. 35-36).

The applicant testified that not until 1955 did he know that ownership of land in the area where he had purchased was denied to United States citizens. In 1955 he went to the American Consulate in Juarez and obtained the information as to the bar to land ownership. The record reveals that on December 13, 1955, applicant appeared at the consulate where he was advised that he would become expatriated on December 24, 1955, under section 350 of the Act if he continued to reside in Mexico (Ex. 3).

We do not believe that applicant comes within section 350 of the Act. Under the circumstances of this case, the execution of the contract of sale between private parties without appearance before a Mexican official, the applicant's lack of knowledge concerning the inability of a non-Mexican national to own land in the area, the applicant's testimony that the issue of nationality did not arise during the transaction, and the testimony that a non-Mexican national who purchased land in error could hold it until the government proceeded against him legally, we find that the Service has failed to establish that applicant voluntarily sought or claimed the benefits of his Mexican nationality when he purchased the property. While there is a presumption that an individual knows the laws of his country, the existence of the presumption does not establish under circumstances such as we have set forth that there was a voluntary seeking of the benefits of foreign nationality. Decisions of the Board on this issue in other cases were made in the belief that land in the proscribed area could not have been acquired without claiming of Mexican nationality; this record establishes the contrary.

What is the effect of the fact that on December 13, 1955, applicant was advised by the State Department that he would become expatriated on December 24, 1955, if he continued to reside in Mexico (Ex. 3)? Was his continued enjoyment of his property after that date a voluntary claim of the benefits of Mexican nationality? We do not believe so. In the absence of evidence that the Mexican authorities sought to divest him of his title and that such divesture was defeated by applicant's claim to Mexican nationality we do not believe it may be said that his continued enjoyment of the property after the conversation with the consul was a voluntary claiming of the benefits of Mexican nationality.

It is to be noted that the purchase of the property occurred on May 5, 1948, some years before December 24, 1952, the effective date of section 350 of the Act. Where the record establishes that the enjoyment of a

benefit of foreign nationality on or after December 24, 1952, was the result of a voluntary seeking or claiming prior to that time, then the continued enjoyment of the benefit brings the individual within section 350 of the Act and loss of United States citizenship results if the enjoyment of the benefit continues for three years after December 24, 1952. The fact that Congress designed the section to divest dual nationals of their United States nationality and not protect it, and the fact that Congress afforded the individual a period of three years after the law became effective to preserve his nationality is the basis for our conclusion (*Matter of V—,* 7 I. & N. Dec. 218; see *Matter of G— Q—,* 7 I. & N. Dec. 195). However, applicant's enjoyment of his property was not based on a claim to Mexican nationality; he has not lost United States citizenship under section 350 of the Act.

**ORDER:** It is ordered that the order of the special inquiry officer be and the same is hereby withdrawn.

*It is further ordered* that the applicant's admission as a United States citizen be authorized.